## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
THEODORE DUNCAN,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        Civil Action No. 14-1642 (ABJ)
                                    )
JEH CHARLES JOHNSON,                )
*Secretary, U.S. Department of*     )
*Homeland Security*,                )
                                    )
                Defendant.          )
_____)

## <u>MEMORANDUM OPINION</u>

   Plaintiff Theodore Duncan brought this employment discrimination lawsuit against Jeh

Charles Johnson, the Secretary of the United States Department of Homeland Security ("the

agency" or "DHS").  Plaintiff alleges that DHS violated the Age Discrimination in Employment

Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"), and Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), when it discriminated against

him based on his age and his gender, and when it retaliated against him in violation of Title VII

for engaging in the protected activity of lodging a discrimination complaint.  Compl. [Dkt. # 1].

Defendant has moved for summary judgment on all three counts on multiple grounds.  Def.'s Mot.

for Summ. J. [Dkt. # 14] ("Def.'s Mot."); Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt.

# 16-1] ("Def.'s Mem."), and plaintiff has opposed the motion.  Pl.'s Opp. to Def.'s Mot. [Dkt.

# 20] ("Pl.'s Opp.").[1]  After reviewing the entire record, the Court concludes that several of

---

1       The Court granted the parties' consent motion to file the summary judgment papers under
seal, in light of the protective order governing the case, and the fact that based on plaintiff's duties,
law enforcement sensitive material might weave itself into the pleadings.  *See* Consent Mot. to File
Under Seal [Dkt. # 12]; Min. Order (Dec. 9, 2015).  Redacted versions of the filings appear on the
public docket.  *See* Def.'s Mot. [Dkt. # 18]; Def.'s Mem. [Dkt. # 18]; Pl.'s Opp. [Dkt. # 21].

plaintiff's claims have not been properly exhausted, and a few fail for lack of an adverse employment action.  The claims that remain fail on the merits.

Plaintiff has come forward with nothing to support his age and gender discrimination claims.  His allegations boil down to the fact that the new supervisor who made him miserable was female and younger than he was.  But he has presented no evidence that would indicate that her treatment of him was motivated by any sort of discriminatory animus, and indeed, he does not press the point very strongly in his opposition.  Even if it is true, as he asserts, that she was not as experienced or as qualified as he was, he certainly cannot complain that she was unfairly or unlawfully elevated to a supervisory position for which he did not even apply.  So the Court will grant summary judgment in favor of defendant on the two discrimination counts.

Plaintiff focuses his efforts on the retaliation count, and he demonstrates that he was the subject of a number of disciplinary or potentially adverse actions after he made an EEO complaint.  But the evidence of the necessary causal connection is quite thin and attenuated, and more important, plaintiff has failed to meet his burden to produce evidence that would lead a reasonable juror to conclude that the legitimate, non-discriminatory reasons proffered by the defendant for its actions were in fact a  pretext for retaliation.  So defendant's motion for summary judgment will be granted on the retaliation claims as well.

## FACTUAL BACKGROUND

The facts are not in dispute except where noted.  Plaintiff, a 56-year-old male, worked as a GS-15 Intelligence Research Specialist at U.S. Immigration and Customs Enforcement ("ICE"), a component of DHS.  Def.'s Statement of Material Facts Not in Genuine Dispute [Dkt. # 18-1] ("Def.'s SOF") ¶¶ 1–2; Pl.'s Statement of Material Facts For Which There Is A Material Dispute [Dkt. # 21-1] ("Pl.'s SOF") ¶¶ 1–2.  From 2003 onward, plaintiff worked in the Office of

Intelligence within the Homeland Security Investigations office, an office that "conducts broad intelligence operations and develops data for use by ICE, [DHS], and other law enforcement partners related to illegal trade, travel, and financial activity."  Def.'s SOF ¶¶ 3, 14; Pl.'s SOF ¶¶ 3, 14.  Beginning in October 2006, plaintiff served as the Deputy Assistant Director ("DAD") of Intelligence Programs within Homeland Security Investigations.  Def.'s SOF ¶ 15; Pl.'s SOF ¶ 15.  Plaintiff's official title remained "Supervisory Intelligence Research Specialist," though his "organizational titles" changed numerous times between 2006 and November 2013.  Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16.

### Plaintiff's Assignment to Work Under the DAD of Analysis

In July 2011, DHS issued a vacancy announcement for the position of Deputy Assistant Director of Analysis, and published the announcement on USA Jobs and through an intelligence community jobs database.  Def.'s SOF ¶ 22; Pl.'s SOF ¶ 22; *see* Ex. 13 to Def.'s Mot. [Dkt. # 18-2] (vacancy announcement).[2]  Plaintiff did not submit an application for the job.  Def.'s SOF ¶ 24; Pl.'s SOF ¶ 24.  Ultimately, Stephanie Andrews was selected for the position for a term not to exceed one year.  Def.'s SOF ¶¶ 25–27, 30; Pl.'s SOF ¶¶ 25–27, 30.[3]

---

[2]     A sealed version of defendant's exhibits appears at docket numbers 15-1 to 15-3, and docket number 24-1.  A redacted version of defendant's exhibits appears at docket numbers 18-2 and 25-1.  Sealed versions of plaintiff's exhibits appear at docket numbers 20-2 to 20-12, and a redacted version of plaintiff's exhibits appear at docket number 21-2 to 21-11.  Page citations to the exhibits refer to the PDF page number of the redacted version.  The parties have not provided redacted versions of deposition excerpts.  *See* Consent Mot. to Seal at 4; Min. Order (Dec. 9, 2015).

[3]     Plaintiff's statement of facts notes that he disputes the fact that Ms. Andrews had to reapply for the DAD position after one year, but he does not provide any reasons for the dispute.  Pl.'s SOF ¶ 30.  By not stating the specific objection with a citation to record evidence, plaintiff has not complied with either Federal Rule of Civil Procedure 56(c)(1)(A), or with Local Civil Rule 7(h)(1).  In any event,  the vacancy announcement for the 2011 position specified the one-year term of the position.  Ex. 13 to Def.'s Mot. at 100.

Meanwhile, in September 2011, Homeland Security Investigations discontinued the project on which plaintiff had been working, and plaintiff was reassigned to the vacant position of Acting Unit Chief of Travel, where he reported to the newly-appointed DAD of Analysis, Andrews. Def.'s SOF ¶¶ 4, 19; Pl.'s SOF ¶¶ 4, 19.  At the time, plaintiff had been working in Baltimore, but with the October 2011 reassignment, he was required to work in Washington, D.C.  *See* Def.'s SOF ¶¶ 17, 20; Pl.'s SOF ¶¶ 17, 20.

Because Ms. Andrews's appointment as DAD of Analysis was limited to a 12-month term, ICE advertised for the DAD of Analysis position again in July of 2012, this time describing the position as "Full Time – Permanent." Ex. 13 to Def.'s Mot. at 102.  Plaintiff did not apply for the position that time either.  Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32.  Ms. Andrews was selected again, and she became the permanent DAD of Analysis in November 2012.  Def.'s SOF ¶¶ 33–34; Pl.'s SOF ¶¶ 33–34.  Plaintiff served as Acting Unit Chief of Travel from October 2011 through February of 2013.  Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4.

**The April 2012 Letter of Counseling and Mid-Cycle Performance Appraisal**

Plaintiff failed to attend a meeting on April 2, 2012, and he explained that he missed the meeting because he was taking a personal telephone call.  Def.'s SOF ¶¶ 42–43; Pl.'s SOF ¶¶ 42–43.  On April 30, 2012, after plaintiff arrived late to three other meetings, and after Andrews consulted with the ICE office of Employee and Labor Relations ("ELR"), and the Office of the Principal Legal Advisor ("OPLA"), Andrews issued plaintiff a letter of counseling relating to his "ongoing failure to attend and be on time for scheduled meetings and training and for unprofessional behavior."  Def.'s SOF ¶¶ 40–41, 47–48; Pl.'s SOF ¶¶ 40–41, 47–48.  The letter explained that plaintiff was late for three meetings, and missed another meeting entirely.  Def.'s SOF ¶ 41; Pl.'s SOF ¶ 41; Ex. 16 to Def.'s Mot. [Dkt. # 18-2] at 126–28.  The letter was not placed

in plaintiff's official personnel folder, but the agency informed him that it could "be relied upon if similar incidents of the same nature occur again." Ex. 16 to Def.'s Mot. at 127. Plaintiff maintains that his need to take a personal call should have excused him from the April 2 meeting, and that the letter of counseling was an improper overreaction. Def.'s SOF ¶¶ 45–46; Pl.'s SOF ¶¶ 45–46.

On the same day that the letter of counseling was delivered, Andrews also issued a mid-cycle appraisal of plaintiff's work performance, which covered the period of November 10, 2011 through April 15, 2012. Def.'s SOF ¶ 50; Pl.'s SOF ¶ 50; Ex. 17 to Def.'s Mot. [Dkt. # 18-2] at 47–71. The mid-cycle review is used by supervisors to discuss the performance of their direct reports. Def.'s SOF ¶¶ 54–55; Pl.'s SOF ¶¶ 54–55. The appraisal, which was drafted with input from ELR and OPLA, noted that plaintiff was not meeting his performance standards, and that his performance was "unacceptable in several core competencies." Ex. 17 to Def.'s Mot. at 146. Plaintiff prepared a written response to the mid-cycle appraisal; he admitted that many of the events cited had occurred, but he attempted to provide excuses for each event, and he argued that the facts did not justify the conclusion that his behavior was unacceptable or unprofessional. Def.'s SOF ¶ 56; Pl.'s SOF ¶ 56; Ex. 18 to Def.'s Mot. [Dkt. # 18-2].

### The May 10, 2012 Performance Improvement Plan

On May 10, 2012, Andrews issued plaintiff a Performance Improvement Plan. Ex. 19 to Def.'s Mot. [Dkt. # 18-2] ("PIP") at 176–96. The PIP "outline[d] activities that [plaintiff] must complete to attain at least an achieved expectations rating on the critical elements in which [his] performance ha[d] fallen to an unacceptable level," and it gave him sixty calendar days to do so. *Id.* at 176–77. On July 13, 2012, Andrews notified plaintiff that he had failed the PIP, Def.'s SOF

¶ 63; Pl.'s SOF ¶ 63, but no adverse action was taken against him as a result.   Def.'s SOF ¶ 64;

Pl.'s SOF ¶ 64.[4]

## Plaintiff's Suspensions

### The agency's procedures for suspending employees.

In determining how to discipline its employees, DHS utilizes the "Policy on Discipline and Adverse Action Operating Procedures" ("DAAOP").   Def.'s SOF ¶ 74; Pl.'s SOF ¶ 74; Ex. 24 to Def.'s Mot. [Dkt. # 18-2] (attaching a copy of the DAAOP).   The process beings when a manager refers a conduct issue to the Employee and Labor Relations department.   *See* Ex. 24 to Def.'s Mot. at 234.   ELR then makes a presentation to a panel of three GS-15 employees, one from Homeland Security Investigations, one from Enforcement and Removal Operations, and one from Management and Administration, which the parties refer to as a "DAAP Panel."   Def.'s SOF ¶¶ 74–76; Pl.'s SOF ¶¶ 74–76.   After the presentation, the panel members come to a consensus agreement on the discipline to be imposed, and they provide the employee with their recommended sanction.   Def's SOF ¶ 76; Pl.'s SOF ¶ 76.   The employee is then given a chance to respond to the recommended sanction.   *See* Ex. 24 to Def.'s Mot. at 229.   Finally, "[t]he Deciding official . . . reviews the charges in the proposal notice, the investigative file, the employee's reply, and aggravating and mitigating factors in order to make a final decision on [the proposed adverse action]."   *Id.* at 230.

---

4      The parties agree that the agency failed to issue plaintiff an end of year performance review for fiscal year 2012.   *See* Def.'s SOF ¶ 70; Pl.'s SOF ¶ 70.   And while there was some confusion at the time with regard to whether plaintiff received a within-grade increase that year, the parties now agree that he did receive a pay increase in 2012.   Def.'s SOF ¶¶ 71–73; Pl.'s SOF ¶¶ 71–73.

<u>The June 2012 three day suspension</u>

On Friday, May 11, 2012, Andrews assigned plaintiff a time-sensitive, classified project. Def.'s SOF ¶¶ 78–79; Pl. SOF ¶¶ 78–79. Defendant contends that plaintiff was instructed that the project was due on Monday, May 14, 2012. Def.'s SOF ¶ 79. Plaintiff argues that the assessment was actually due on May 10, 2012, and that it was already overdue when Andrews assigned the task to him. Pl.'s SOF ¶ 79. In any event, plaintiff took unscheduled leave on May 14, 2012, and despite being in touch with Andrews multiple times over the course of the day, he failed to communicate that the assessment was due and locked in his personal safe. Def.'s SOF ¶ 80; Pl.'s SOF ¶ 80. The agency contends that plaintiff's communication failure led to the untimely completion of the assessment, and also wasted other employees' time. Def.'s SOF ¶ 81.[5]

Andrews reported the incident to ELR, and ELR submitted the matter to a review panel. Def.'s SOF ¶¶ 82–83; Pl.'s SOF ¶¶ 82–83.[6] The review panel concluded that plaintiff should be suspended for five days. Def.'s SOF ¶ 84; Pl.'s SOF ¶ 84; *see* Ex. 26 to Def.'s Mot. [Dkt. # 18-2] at 253–57 (June 1, 2012 proposed suspension letter). Plaintiff submitted his response in writing, and Frank Reeder, the final decision maker, mitigated the length of the suspension to three days. Def.'s SOF ¶ 87; Pl.'s SOF ¶ 87; Ex. 26 to Def.'s Mot. at 250.

---

[5]    Plaintiff does not dispute that other employees had to complete the assessment in his absence, but he counters that because he was on leave, he was "not required and not able to work on this task and therefore someone else had to complete the task." Pl.'s SOF ¶ 81.

[6]    Plaintiff notes a "genuine dispute that Plaintiff's supervisor provided documentary evidence to ELR," and then includes the phrase, "knowingly provided false documentation." Pl.'s SOF ¶ 82. The Court understands plaintiff to be arguing that Andrews knowingly provided false documentation to ELR.

<u>The January 2013 seven day suspension</u>

A few months later, on October 17, 2012, plaintiff was informed that another DAAP Panel had recommended that he be suspended for fourteen days.  Def.'s SOF ¶ 94; Pl.'s SOF ¶ 94.  The panel contended that the suspension was warranted in light of plaintiff's:  "(1) Failure to Promptly and fully comply with directions, instructions, or assignments of a supervisor; (2) Absence without Leave (AWOL); (3) Making misstatements or misrepresentations, [and] (4) Unprofessional behavior."  Def.'s SOF ¶ 94; Pl.'s SOF ¶ 94; *see also* Ex. 31 to Def.'s Mot. [Dkt. # 18-2] at 316. Thereafter, Robert Bentall, the Chief of Staff of HSI-Intelligence, sustained a few of the charges against plaintiff:[7]  (1) the charge that plaintiff was AWOL on September 12, 2012, (2) the charge that he made misrepresentations regarding his leave on that date; and (3) that he was "argumentative in [his] July 6, 2012 communication with [his] supervisor."  Ex. 31 to Def.'s Mot. at 316–17.  In light of plaintiff's contrition, Bentall mitigated the proposed suspension from fourteen days to seven days.  *Id.*

### Plaintiff's security clearance

In December 2012, Andrews suspected that plaintiff had improperly distributed information about a confidential informant, Def.'s SOF ¶ 101[8], and she reported her concerns to the ICE Personnel Security Unit.  Def.'s SOF ¶¶ 102–03; Pl.'s SOF ¶¶ 102–03.  Though the facts are a bit murky on what happened next, it appears that plaintiff's security clearance was suspended

---

7    Although Reeder would have been the usual decisionmaker on issues like this one, in light of the fact that Reeder had sustained a previous suspension of plaintiff, Reeder decided to excuse himself from this suspension decision.  Def.'s SOF ¶ 96; Pl.'s SOF ¶ 96.

8    Plaintiff vigorously disputes wrongdoing with regard to this issue.  He contends that "Andrews falsely accused him of disseminating finished intelligence product knowing that he was not the one that disseminated the product and that the information was not disseminated to anyone that did not have the need to know."  Pl.'s SOF ¶ 101.

pending further investigation.  *See* Pl.'s SOF ¶ 102 (noting that Andrews, in reporting plaintiff, knew that the report "would at least result in the temporary suspension of his security clearance."). While plaintiff's clearance was suspended, he held the same position, but his duties were changed because he no longer had access to classified information, which was necessary to perform his job as Unit Chief of Travel.  Def.'s SOF ¶ 106; Pl.'s SOF ¶ 106.  Plaintiff's clearance was reinstated about three months after it was suspended.  Def.'s SOF ¶ 107; Pl.'s SOF ¶ 107.

### Plaintiff's reassignment

On April 12, 2013, after plaintiff's security clearance had been reinstated, Reeder emailed Bentall and asked him to think about where plaintiff could be assigned "that will add the greatest value to the office and take appropriate advantage of his grade and experience," and Reeder encouraged Bentall to "ask [plaintiff] where he would like to work."  Def.'s SOF ¶ 108; Pl.'s SOF ¶ 108.[9]  The parties disagree about what followed.  Defendant asserts that Bentall presented plaintiff with two options, both GS-15 positions:  one was a supervisory position, and one was a non-supervisory policy position.  Def.'s SOF ¶ 109, citing Dep. of Roger Bentall (Oct. 1, 2015), Ex. 33 to Def.'s Mot. [Dkt. # 15-3] ("Bentall Dep.") at 79:8–80:1.  Plaintiff contends that he was not informed that there were two positions, nor was he presented with an option for a supervisory position.  Pl.'s SOF ¶ 109.

On January 7, 2014, Bentall issued a Notification of Reassignment to plaintiff, which reassigned him from his position as a Supervisory Intelligence Research Specialist to an Intelligence Research Specialist, effective November 17, 2013.  Def.'s SOF ¶ 112; Pl.'s SOF ¶ 112.  After the reassignment, which did not have an effect on his grade, salary, or pay, plaintiff

---

9       The parties agree that reassignment was warranted, in light of the fact that the relationship between plaintiff and Andrews "was so broken that it was not going to a good working relationship in the future."  Def.'s SOF ¶ 115; Pl.'s SOF ¶ 115.

was assigned to work in a cubicle instead of being provided with an office.  Def.'s SOF ¶¶ 113–114; Pl.'s SOF ¶¶ 113–14.

## PROCEDURAL HISTORY

### Plaintiff's EEO Complaints

Plaintiff made his first contact with ICE's Office of Diversity and Civil Rights ("ODCR") on May 11, 2012, the day Andrews placed him on the PIP.  Ex. 8 to Def.'s Mot [Dkt. # 18-2] at 40.  His initial report alleged discrimination based on race, age, and parental status, and it pointed to the April 2012 letter of counseling and the May 2012 placement on a performance improvement plan, as well as alleged harassment by Andrews.  *Id.* at 40–42.  More than six months later, on November 30, 2012, plaintiff submitted his first and only formal complaint of discrimination to ODCR.  Ex. 9 to Def.'s Mot. [Dkt. # 18-2] at 44–49.  The complaint alleged sex and age discrimination and unlawful reprisal.  *Id.*  Plaintiff stated that beginning in October 2011, when Andrews became the DAD of Analysis, "she proceeded to create a working environment that is beyond hostile and consisted of daily micro-managing, intense targeting and harassment that continues to this very day."  *Id.* at 46.  He alleged that after he received the April 30, 2012 letter of counseling from Andrews, and he complained about it, the agency took the following retaliatory actions:

- May 10, 2012:  Placing plaintiff on a performance improvement plan for sixty days, *id.*;

- June 30, 2012:  Suspending plaintiff for three days for "not conducting official business while on emergency personal leave," *id.*;

- July 1, 2012:  Informing plaintiff that he failed the performance improvement plan, *id.*; and

- October 15, 2012:  Suspending plaintiff for two weeks.  *Id.*

Plaintiff expressed the fear that Andrews's conduct would lead him to suffer a "heart attack," and he stated that her "[e]xcessive monitoring, piling on, targeting and harassment . . . has been consistent and elevated."  *Id.* at 48.

### District court proceedings

Plaintiff filed this action in federal court on October 1, 2014.  Compl.  In Count I, plaintiff alleges that defendant discriminated against him based on his age in violation of the ADEA when he (1) was "subjected to a hostile working environment created by Andrews"; (2) received the negative Mid-Cycle review; (3) was placed on a PIP; (4) was suspended for three days; (5) was not selected for the position of DAD of Analysis; (6) was suspended for one week; (7) was "investigated based on false allegations" related to his security clearance; and (8) was "involuntarily permanently reassigned from a supervisory GS-15 to a non-supervisory GS-15." Compl. ¶ 63.   In Count II, plaintiff alleges that the same eight circumstances constituted discrimination based on gender in violation of Title VII.  *Id.* ¶ 71.  And in Count III, plaintiff claims that a set of seven actions were taken in retaliation for the protected activity of "filing EEO complaints and reporting age and gender discrimination," in violation of Title VII:  (1) being placed on a PIP; (2) being suspended for three days; (3) receiving the proposal that he be suspended for two weeks; (4) the non-selection as DAD of Analysis; (5) the one-week suspension; (6) "being investigated based on false allegations"; and (7) being reassigned to a non-supervisory position. *Id.* ¶¶ 83–85.

On December 15, 2015, defendant moved for summary judgment.  Def.'s Mot.  Plaintiff opposed the motion on January 22, 2016, Pl.'s Opp., and defendant replied in support of his motion on February 11, 2016.  Def.'s Mem. of P. & A. in Reply to Pl.'s Opp. [Dkt. # 25-1] ("Def.'s Reply").

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

**ANALYSIS**

Plaintiff claims that the agency discriminated against him on the basis of both his age and his gender in connection with the Letter of Counseling, the PIP, and the two suspensions, and in failing to select him for the DAD position and later reassigning him to a non-supervisory position. He also claims that many of the agency's actions were taken in retaliation for the fact that he made

an EEO complaint.  According to the plaintiff, "the Agency failed to discipline Ms. Andrews in any fashion for similar misconduct," and "Ms. Andrews increased her harassment of Plaintiff after his involvement in EEO activity."  Pl.'s Opp. at 3.

There is no question that the relationship between the plaintiff and his supervisor was marked with conflict from the beginning, and it may be that she had a tendency to micromanage, or that she was petty or difficult to work with for myriad reasons.  But in the absence of evidence of discrimination or retaliation, it is not the Court's role to act as a "super-personnel department." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006), quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999).  Here, plaintiff has failed to exhaust his administrative remedies with respect to some of his allegations, and others do not rise to the level of actionable adverse actions. On the issues that remain, plaintiff has not pointed to any facts that would tie any of the agency's actions to unlawful bias against him because of his age or his gender.  And with respect to the alleged retaliation, since defendant has come forward with evidence to show that plaintiff was disciplined because of his poor job performance, and not for a retaliatory purpose, and plaintiff has failed to come forward with evidence to show that defendant's stated reasons were either pretextual or tainted by any alleged improper animus on the part of his supervisor, the Court will grant defendant's motion for summary judgment.

## I.      Plaintiff's age and gender discrimination claims in Counts I and II fail.

### A.      The exhaustion issue

Defendant first moves for summary judgment on Counts I and II on the grounds that four

of the seven[10] events alleged to be discriminatory were not administratively exhausted:  (1) the

August 7, 2011 reassignment to the position of Acting Unit Chief and assignment to ICE

Headquarters in Washington, D.C.; (2) the July 9, 2012 three-day suspension; (3) the January 15,

2013 seven-day suspension; and (4) the December 6, 2013 suspension of plaintiff's security

clearance.  But the Court will only enter judgment for the defendant on one of these allegations on

exhaustion grounds.

Both the ADEA and Title VII require that before filing a lawsuit in federal court, a plaintiff

must timely pursue and exhaust administrative remedies.  *Hamilton v. Geithner*, 666 F.3d 1344,

1349 (D.C. Cir. 2012) (Title VII); *Washington v. Wash. Metro Transit Auth.*, 160 F.3d 750, 752

(D.C. Cir. 1998) (Title VII & ADEA); *see also Bowden v. United States*, 106 F.3d 433, 437 (D.C.

Cir. 1997) (Title VII).  To timely exhaust administrative remedies, an employee must consult an

agency EEO Counselor within forty-five days of the alleged discriminatory event, 29 C.F.R.

§ 1614.105, and must file a formal complaint within 180 days of the alleged discriminatory event.

*See generally* 42 U.S.C. § 2000e–16; 19 C.F.R. § 1614.106(a).

"These procedural requirements governing [a] plaintiff's right to bring a Title VII claim in

federal court are not trivial."  *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 68 (D.D.C. 2007).

"Because timely exhaustion of administrative remedies is a prerequisite to a Title VII action

---

10      Plaintiff's complaint alleges that he was "subjected to a hostile working environment created by Andrews."  Compl. ¶¶ 63, 71.  Plaintiff has since made clear, though, that "he did not make a hostile work environment claim."  Pl.'s Opp. at 21 n.10.  So to the extent that plaintiff's complaint could be read to assert a hostile work environment claim, the Court will grant summary judgment to defendant on that issue.

against the federal government," a court may not consider a discrimination claim that has not been

exhausted. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003). However, the D.C. Circuit

has made clear that "the exhaustion of remedies is not jurisdictional, but more akin to a statute of

limitations," *id.* at 425, which is therefore "subject to equitable tolling, estoppel, and waiver."

*Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015), quoting *Bowden*, 106 F.3d at 437.

### 1. Plaintiff's claim with regard to his 2011 reassignment to the Unit Chief position was not administratively exhausted.

Plaintiff alleges that his initial August 8, 2011 assignment to the position of Unit Chief

under Andrews's supervision was discriminatory. Pl.'s Opp. at 12. Plaintiff's first contact with

an agency EEO Counselor was on May 11, 2012. Ex. 5 to Pl.'s Opp. [Dkt. # 21-5] (EEO

Counselor's Report). The Counselor's Report indicates that plaintiff complained that he was

discriminated against based on his age and parental status when Andrews issued the April 30, 2012

letter of counseling, when she placed him on a PIP on May 11, 2012, and when he was subjected

to her ongoing harassment from April 30, 2012 onward. Ex. 5 to Pl.'s Opp. at 1. Because

plaintiff's first complaint did not reference the August 8, 2011 reassignment at all, and because

even if it had, it would have been more than 45 days after the alleged discriminatory event,

defendant asserts that this claim is time-barred. Def.'s Mem. at 8–9.

Plaintiff argues that this analysis should not bar his claim that his 2011 assignment to the

Unit Chief position was discriminatory because "[t]he facts show that Mr. Duncan believed that

the reassignment would be temporary. Further, the facts show that Mr. Duncan did not believe his

reassignment was discriminatory until he learned it was a permanent reassignment, meaning he

was still working in the same position, over a year later." Pl.'s Opp. at 12.

But even if a later complaint would satisfy the timeliness requirement, plaintiff has not

provided any evidence to show that he *ever* asserted that the reassignment was discriminatory. In

the formal complaint before the agency, plaintiff does allege that the reassignment was a demotion.

*See* Ex. 9 to Def.'s Mot. (November 30, 2012 formal complaint).  But he expresses dissatisfaction

with the post because of the burdens it imposed, and he does not raise questions about the reasons

behind it:

> Throughout this assignment I consistently conveyed to ICE management the intense financial and physical strain it as putting on me and my family. As a single parent of 3 kids, they made it virtually impossible for me to survive financially and to meet my family obligations.  My commute went from 40 min[utes] one way to 2 hours and 30 min[utes] one way and if there was any traffic delays, my commute went to 3 hours one way.  The financial toll that it has taken on me has been devastating and I repeatedly expressed this to ICE management but it [fell] on deaf ears.

*Id.* at 4.  Plaintiff's response to interrogatories before the agency makes the point even more

strongly:

> Personally, this detail which I was assured would only being [sic] for 60 days has now lasted over 2 years and continues to this very day with no end in sight has ruined my life . . . . Physically, the stress from being on this detail and the subsequent hostile attacks, daily harassment, and reprisals has lead [sic] to [a series of medical issues].

Ex. 1 to Pl.'s Opp. [Dkt. # 21-2] ("Pl.'s Interrogs.") at 8.  So plaintiff has never put the agency on

notice of a complaint that the *transfer* was discriminatory in some way, and even if the allegation

had been properly exhausted, he has not come forward with any evidence to tie the alleged

demotion to any protected characteristic.  Rather, plaintiff's concern seems to be that that the

transfer put him in a position where he would then be discriminated against by Andrews.  Because

no reasonable jury would conclude that plaintiff administratively exhausted a claim that the

transfer itself was discriminatory, or that there was any discriminatory animus behind it, this claim

will not survive summary judgment.

### 2.     The suspension claims are not barred by the exhaustion requirement.

Defendant also asserts that plaintiff failed to exhaust either of his suspensions.  Def.'s Mem. at 8–9.  The agency contends that because plaintiff's initial contact with the EEO Counselor was on May 11, 2012, and his formal complaint was filed on November 30, 2012, he did not timely exhaust the June 2012 and January 2013 actions.  *Id.*

Plaintiff argues that, with regard to the three-day suspension, he "continuously tried to contact the EEO counselor but with no success," and in any event, "his claims were accepted by the EEO office and investigated for several months," so "[c]ertainly, the Agency's EEO office had an opportunity to handle these matters internally."  Pl.'s Opp. at 12.  It is true that plaintiff's counsel sent a letter on November 12, 2012 to the Assistant Director of the internal EEO office which noted that plaintiff's claims were based in part on the June 30, 2012 suspension.  Ex. 8 to Pl.'s Opp. [Dkt. # 21-8]  But the November 12, 2012 letter was sent 135 days after the suspension took effect, which is far more than the 45 days required by law.

While the statutory time limits can be tolled in certain circumstances, *see Doak*, 798 F.3d at 1104, the burden is on plaintiff to show that tolling should apply.  *Bowden*, 106 F.3d at 437. Plaintiff has put forth no evidence to prove that he unsuccessfully attempted to add the three-day suspension to his initial complaint, and so he has failed to create a genuine issue of material fact on that point.  So the Court could find that the June 30, 2012 suspension was not administratively exhausted.  But, one goal of administrative exhaustion is to give the agency an opportunity to resolve the issue informally, *see Loe v. Heckler*, 768 F.2d 409, 418 (D.C. Cir. 1985), and the agency did in fact consider this issue before the lawsuit was filed.  Ex. 9 to Pl.'s Opp. [Dkt. # 21-9] at 3 (agency's acceptance of EEO complaint, recognizing the three-day suspension).  So the Court will consider it on the merits here.

17

With regard to the seven-day suspension, plaintiff contends that he contacted an EEO counselor within 45 days of learning of the proposed suspension. Pl.'s Opp. at 12. While the agency is correct that plaintiff did not contact an EEO Counselor within 45 days of serving the actual suspension, Def.'s Mem. at 9, plaintiff did contact an EEO Counselor within 45 days of learning of the DAAP Panel's proposed suspension. *See* Ex. 31 to Def.'s Mot. at 321–27 (proposal for a fourteen-day suspension dated October 17, 2012); Ex. 9 to Pl.'s Opp. (formal EEO complaint dated November 29, 2012). So the Court will consider this suspension on the merits as well.

### 3.   Plaintiff may have exhausted the revocation of his security clearance.

Defendant claims that plaintiff never exhausted the temporary revocation of his security clearance. Def.'s Mem. at 7. Plaintiff's formal EEO complaint, dated November 29, 2012, referenced, among other things, the following issues: the three-day suspension, the circumstances surrounding the PIP, and Andrews's selection as DAD of Analysis. Ex. 9 to Def.'s Mot. Then, more than a year later, on December 10, 2013, plaintiff's attorney submitted a letter to the internal EEO office alleging that plaintiff was "permanently removed" from his position, and that he "still doesn't have his SCI clearance." Ex. 8 to Pl.'s Opp. But the letter is clear that those two issues are distinct from plaintiff's original complaint:

> My office is currently representing Mr. Theodore Duncan on an EEO complaint, HS-ICE-22505-2012. That case is towards the end of the investigation stage and my client does not wish to combine that complaint with any other. Kindly consider this letter notice of Mr. Duncan's additional complaint for events occurring November 19, 2013.

*Id.* So it is unclear whether plaintiff ultimately received a disposition on that new complaint, and it is therefore unclear whether the security clearance issue was timely exhausted. But because that claim would fail on the merits, as well, the Court will assume without deciding that it was timely exhausted.

**B.** **The remainder of plaintiff's discrimination claims fail because several of the allegations do not involve adverse employment actions, and he has failed to show pretext as to the other issues.**

Title VII of the Civil Rights Act of 1964 was enacted to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013). The anti-discrimination provision "makes it unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008), quoting 42 U.S.C. § 2000e-2(a). As the D.C. Circuit has explained, to state a *prima facie* case of disparate treatment under Title VII's antidiscrimination provision, the plaintiff must establish two essential elements: "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), citing 42 U.S.C. § 2000e-16(a); *see also* 29 U.S.C. § 633a(a) (providing that, pursuant to the ADEA, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age.").

Plaintiff claims that the agency discriminated because of his age or gender when it did not select him for the position of Deputy Assistant Director of Analysis; gave him an adverse mid-cycle review; put him on a PIP for sixty days; suspended him for three days; suspended him for one week; investigated him based on false allegations which led to the suspension of his security

clearance; and reassigned him to a non-supervisory position.  *See* Compl. ¶¶ 63 (age); 71 (gender).[11]

So the first question to be resolved is whether the complained-of instances of discrimination constitute "adverse employment actions" under the statute.

### 1.   Some of plaintiff's allegations are not adverse employment actions.

Defendant moves for summary judgment on Counts I and II in part on the grounds that the adverse mid-cycle review, the placement on a performance improvement plan, the non-selection as Deputy Assistant Director of Analysis, the temporary suspension of plaintiff's security clearance, and the re-assignment to a non-supervisory position, did not constitute adverse events. Def.'s Mem. at 21–22, 24, 30–31, 33.

Not every action by an employer against an employee qualifies as an "adverse employment action" that is protected by Title VII.  *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").   An actionable adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  To ultimately establish an adverse employment action, a plaintiff must show that she "experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities

---

11     Defendant asserts that during discovery, plaintiff identified fifteen events that he alleges are evidence of discrimination or retaliation.  *See* Def.'s Mem. at 1–3 (listing the issues).  But plaintiff's complaint limited itself to eight issues.  Compl. ¶¶ 63, 71.  And plaintiff did not seek leave at any time during this litigation to amend his complaint to add other issues.  So because the landscape must be limited to the issues identified in the complaint, the Court will not resolve any issues relates to the seven issues not identified in plaintiff's complaint.

such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131.  Plaintiff must, "in most cases," show "direct economic harm," *Ellerth*, 524 U.S. at 762, affecting, for instance, his grade or salary. *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).[12]

### a.    Adverse Mid-Cycle Review

Plaintiff contends that the adverse rating on the April 30, 2012 mid-cycle review was discriminatory.  Compl. ¶¶ 63(b); 71(b).  But plaintiff admits that the mid-cycle appraisal "is only a progress review and has no defined numerical values or ratings assigned," and that "[t]he terms used to describe [the employee's] performance are general terms used by the rating official to assess [his] progress."  Def.'s SOF ¶ 54; Pl.'s SOF ¶ 54.  So because the mid-cycle review did not cause any "significant change in employment status," *Ellerth*, 524 U.S. at 761, and because it did not "affect[] the terms, conditions, or privileges of employment or future employment," *Forkkio*, 306 F.3d at 1131, it was not a materially adverse employment action.  *See also Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009) (noting that "performance evaluations ordinarily are not actionable under Title VII" when they "do not obviously result in a significant change in employment status").

### b.    Performance Improvement Plan

Plaintiff also alleges that the agency's decision to place him on a performance improvement plan for sixty days was discriminatory.  Compl. ¶¶ 63(c); 71(c).  While the agency acknowledges that the "failure of a PIP can result in demotion, suspension, or disciplinary action," Def.'s SOF ¶ 64, in this case, plaintiff admits that "no adverse action was taken against [him] for failing the PIP."  *Id.*; Pl.'s SOF ¶ 64.  So because the failure of the PIP did not cause any "direct economic harm," *Ellerth*, 524 U.S. at 762, or any lead to any "materially adverse consequences," *Forkkio*,

---

12    The government concedes that plaintiff's suspensions were both adverse employment actions.  Def.'s Mem. at 19 & n.3.

306 F.3d at 1131, it cannot form the basis of a discrimination claim either.  *See also Taylor*, 350 F.3d at 1293 (finding that a PIP did not constitute an adverse employment action where the plaintiff did not allege that the PIP affected her grade or salary or cause a significant change in her employment status).

<strong>c.</strong>    <u>Non-selection as Deputy Assistant Director of Analysis</u>

Plaintiff next asserts that the fact that he was not selected to be the Deputy Assistant Director of Analysis was discriminatory.  Compl. ¶¶ 63(e); 71(e).  This claim ultimately does not get past "Go" because, as plaintiff admits, while the position was advertised twice, he never applied for it.  Def.'s SOF ¶¶ 24, 32, Pl.'s SOF ¶¶ 24, 32.  So it is a stretch to call this decision an "action" that plaintiff suffered, much less, an adverse one.  But in response to the motion for summary judgment, plaintiff advances the theory that the DAD of Analysis position "is substantively the same position" as the position that plaintiff previously held, the DAD of Intelligence Programs, and that Mr. Duncan was somehow "already holding the position" for which Andrews was selected.  *See* Def.'s SOF ¶¶ 35–36; Pl.'s SOF ¶¶ 35–36; *see also* Pl.'s Opp. at 4.  Thus it is not entirely clear whether plaintiff is asserting that the agency's selection of Andrews as the DAD of Analysis constituted a failure to hire the plaintiff, a denial of a lateral transfer to plaintiff, a demotion, or some other event, and therefore it is difficult to ascertain whether such an action would be adverse.  But the Court will assume without deciding that not selecting the plaintiff for the position was an adverse employment action, and it will dispense with this claim on the merits.

<strong>d.</strong>    <u>Suspension of security clearance</u>

Plaintiff claims that the temporary suspension of his security clearance was discriminatory.  Compl. ¶ 63(g) (alleging that "being investigated based on false allegations" was discriminatory); 71(g) (same).  Defendant moves for summary judgment in part on the grounds that the Court lacks jurisdiction to review these sorts of decisions by security personnel.  Def.'s Mem. at 31 n.6.

It is true that the D.C. Circuit has held that district courts lack subject matter jurisdiction over claims relating to the revocation of security clearances, and it has held in that context that "an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII." *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999). The D.C. Circuit in *Ryan* relied on the Supreme Court's pronouncement in *Department of Navy v. Egan*, 484 U.S. 518 (1988):

> For "reasons . . . too obvious to call for enlarged discussion," the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable martin of error in assessing the potential risk.

*Id.* at 529, quoting *CIA v. Sims*, 471 U.S. 159, 170 (1985).

In *Ryan*, the plaintiffs had been denied federal jobs because they were not granted the requisite security clearances, and they sued, alleging discrimination. 168 F.3d at 522–23. The Court of Appeals held that it was precluded from reviewing their claim, because it could not assess whether the challenged action was an adverse employment action "without running smack up against *Egan*." *Id.* at 523–24. And because the federal agency's proffered non-discriminatory reason for not hiring the plaintiffs was that they could not obtain security clearances, the court ruled that the plaintiffs "could not challenge the proffered reason's authenticity without also challenging its validity." *Id.* at 524. Because the plaintiffs in *Ryan* could not challenge the validity of the agency's explanation without asking the court to review the merits of the security clearance decision – an action forbidden by *Egan* – the D.C. Circuit found that it lacked subject matter jurisdiction over the dispute. *Id.*

But the D.C. Circuit has since explained that its broad pronouncement in *Ryan* allows for some review of security-clearance-related discrimination.  *See Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012).  In *Rattigan*, an employment discrimination plaintiff alleged that officials at the FBI retaliated against him "by reporting unfounded security concerns to the Bureau's Security Division," which "prompted an investigation into his continued eligibility for a security clearance."  *Id.* at 765.  The Court of Appeals explained that "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other . . . employees who merely report security concerns."  *Id.* at 768.

In this case, defendant asserts that Andrews reported plaintiff to the ICE Personnel Security Unit because she allegedly "suspect[ed] that Plaintiff had improperly distributed information about a confidential informant."  Def.'s SOF ¶¶ 101, 103.  Plaintiff contends that there is a genuine dispute about whether Andrews actually suspected plaintiff of wrongdoing, or if the referral to the security office was intentionally false.  Pl.'s SOF ¶ 101.  But even if there is a genuine dispute on that question, there is no genuine dispute that it was Andrews who reported plaintiff to the security office.  And so, because the absolute bar on judicial review "does not preclude all review of decisions by other . . . employees who merely report security concerns," *Rattigan*, 689 F.3d at 768, the Court has subject matter jurisdiction over the question of whether Andrews initiated the investigation into plaintiff's suitability for a security clearance with a retaliatory or discriminatory motive.  *See id.*

The Court of Appeals in *Rattigan* concluded that there can be liability for a security investigation referral only where "agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false."  *Id.* at 771.  This suggests

that the referral can constitute an adverse action under Title VII. And here, the parties agree that while plaintiff held the same position while his clearance was suspended, "his duties were changed because he no longer had access to classified information, which is necessary to perform the Unit Chief function." Def.'s SOF ¶ 106; Pl.'s SOF ¶ 106. Thus, it appears that the limitation could have affected the terms, conditions, or privileges of plaintiff's employment, *Forkkio*, 306 F.3d at 1131, and the Court must consider this allegation on the merits.

e.   <u>Reassignment to a non-supervisory position</u>

Finally, plaintiff contends that in 2014 he was reassigned "from a supervisory GS-15 to a non-supervisory GS-15" position, because of his age and gender. Compl. ¶¶ 63(h), 71(h). But plaintiff admits that the reassignment had no effect on his grade, salary, or pay. Def.'s SOF ¶¶ 113–114; Pl.'s SOF ¶¶ 113–14. In his deposition, plaintiff explained that the only harm associated with the reassignment was that he faced "the stress and the humiliation of the day-to-day people walking by and seeing [him] no longer having the status that [he] once had," and that "as far as my future . . . is concerned, it could definitely have an impact on any future outside employment that I'm seeking to get." Dep. of Theodore Robert Duncan (Oct. 15, 2015), Ex. 2 to Def.'s Mot. [Dkt. # 15-1] ("Pl.'s Dep.") at 141:1–142:4. But plaintiff's testimony that the reassignment would impact future career choices was immediately undercut by his admission that he was soon moved to a supervisory position within the agency. *Id.* at 142:5–143:7.

So plaintiff has not shown that there were any adverse consequences that flowed from his reassignment. *Forkkio*, 306 F.3d at 1131. And the Court finds below that any claim based on that action fails on the merits in any event.

### 2. Plaintiff cannot show that the reasons offered in support of the challenged decisions were pretextual.

Defendant has come forward with evidence to show that there were legitimate, non-discriminatory concerns about plaintiff's performance and professionalism in the workplace that prompted each of the adverse actions that are to be considered on the merits. *See* Def.'s Mem. at 20–26, 29, 34. So the burden shifts to plaintiff to prove in each instance that the agency's stated reason was merely a pretext for an action that was actually motivated by the fact that plaintiff was a middle aged male.

In this case, plaintiff does not point to any direct evidence of discrimination. When a plaintiff brings a disparate treatment claim under the anti-discrimination provision of either Title VII or the ADEA, and he relies on circumstantial evidence to establish the employer's unlawful motivation, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb*, 433 F.3d at 895.[13] Once a *prima facie* case is established, then "[t]he burden . . . must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 804; *see Holcomb*, 433 F.3d at 896–97. If a legitimate, non-discriminatory reason is given, the burden shifts back to the plaintiff to prove that the proffered reason is a pretext for discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 803; *Holcomb*, 433 F.3d at 896.

---

13    To establish a prima facie case of disparate treatment discrimination, "the plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination." *Forkkio*, 306 F.3d at 1130.

But in cases like this one where the defendant proffers legitimate, non-discriminatory or non-retaliatory reasons for the challenged actions, the court need not conduct the threshold inquiry into whether the plaintiff established a *prima facie* case of discrimination.  Instead, the court is required to analyze whether the defendant's asserted reason is in fact a legitimate, non-discriminatory explanation. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) ("Lest there be any lingering uncertainty, we state the rule clearly:  In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

Once the defendant has proffered a legitimate explanation, then the burdens shifts to the plaintiff to demonstrate why the defendant is not entitled to judgment as a matter of law.  In the context of a disparate treatment claim, the plaintiff may defeat summary judgment by proving either that the defendant's legitimate, non-discriminatory reason is a pretext for discrimination, *McDonnell Douglas*, 411 U.S. at 804, or that the employment action was motivated by discrimination in addition to the proffered legitimate reason.  *Nassar*, 133 S. Ct. at 2522–23; *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007); *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (explaining the difference between a "single-motive" and a "mixed-motive" disparate treatment case).  Plaintiff at this juncture bears the burden of persuasion. *McIntyre v. Peters*, 460 F. Supp. 2d 125, 132–33 (D.D.C. 2006).

In opposition to the dispositive motion, plaintiff summarizes his case as follows:

> The record evidence reveals that shortly after Mr. Duncan complained about discrimination, he was placed on a performance improvement plan ("PIP"), given a substandard rating on his mid-cycle review, issued a letter of counseling, and suspended from duty without pay for three days.  Further

evidence reveals that when Mr. Duncan continued to complain about discrimination[,] the Agency determined he failed his PIP, suspended him from duty for seven days, suspended his security clearance, transferred him to a non-supervisory position, and removed him from his position of record.  In particular, the documents and testimony demonstrate that Mr. Duncan suffered these employment actions within weeks of participating in the equal employment opportunity . . . complaint process.  In addition, the evidence shows that his supervisor, Stephanie Andrews . . . , made the decisions to take these adverse actions against Mr. Duncan. . . .

Despite Defendant's several attempts to portray Mr. Duncan's lawsuit as merely an expression of dissatisfaction with his supervisor, the record clearly demonstrates that Ms. Andrews increased her harassment of Plaintiff after his involvement in EEO activity. . . . As such, when, as the case here, a federal employee suffers increased harassment after contacting an EEO counselor and the Agency fails to discipline a younger female employee for similar misconduct, it is appropriate for a jury to determine if discrimination and retaliation were indeed the motives.

Pl.'s Opp. at 1–3.

Other than the stray reference to Andrews's undisputed age and gender, plaintiff has come forward with no evidence to show that the agency was acting out of discrimination based on those protected characteristics – the gravamen of his complaint is that the agency's actions were all taken in retaliation for his prior protected activity.

And to the extent that plaintiff's discrimination claims are premised on the contention that Andrews was treated differently than he was although she committed similar offenses, plaintiff has put forth no evidence on that issue.  "A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different [protected class] . . . more favorably in the same factual circumstances.'"  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015), quoting *Brady*, 520 F.3d at 495.  "To prove that he is similarly situated to another employee, a plaintiff 'must demonstrate that [he] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness.'"  *Id.*, quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).

But plaintiff has not shown that Andrews committed any "offenses" at all, let alone that those offenses arose out of the same factual circumstances. In the single sentence devoted to this crucial issue in plaintiff's opposition to the motion for summary judgment, plaintiff argues that "Stephanie Andrews [] was not disciplined even though she has been the subject of multiple complaints and investigations." Pl.'s Opp. at 15, citing Andrews Dep., Ex. 4 to Pl.'s Opp. [Dkt. # 20-5] at 12:20–24:21, 25:10–27:2. The cited portions of the deposition reveal two pieces of information. First, at some point, another of Ms. Andrews's subordinates filed an EEO complaint against her. Andrews Dep. at 13:16–14:21. Andrews could not recall the basis or the approximate date of the complaint. *Id.* at 13:22–14:5. And second, Andrews was the subject of an Office of Professional Responsibility administrative inquiry into the work environment in the Analysis Division. *Id.* at 25:13–26:4. That inquiry concerned whether Andrews and the Division Director maintained a hostile work environment. *Id.* at 26:2–9. Andrews testified that she was not aware of the outcome of that inquiry. *Id.* at 26:16–18. So plaintiff has produced no *evidence* that Andrews engaged in misconduct at all; he has simply shown that he is not the only employee to have accused her of discrimination. And he has not produced any evidence to show that Andrews, or any other younger female, committed offenses that were similar to those for which he was sanctioned, or that she was treated differently at the time.

The Court concludes that no reasonable jury could find that defendant's grounds for subjecting plaintiff to discipline were merely a pretext for either age or gender discrimination, and so it will grant summary judgment to the agency on Counts I and II.

## II.    Plaintiff's retaliation claims also fail.

Plaintiff claims in Count III that the agency retaliated against him in violation of Title VII when (1) it placed him on a PIP for sixty days; (2) suspended him for three days without pay;

(3) proposed to suspend him for two weeks without pay; (4) failed to select him for the position for DAD of Analysis; (5) suspended him for one week without pay; (6) caused him to be "investigated based on false allegations," and (7) permanently reassigned him to a non-supervisory position.  Compl. ¶ 83.

To establish a *prima facie* case of retaliation, "the plaintiff must present evidence that (1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) the adverse action was causally related to the exercise of [his] rights." *Holcomb*, 433 F.3d at 901–02.  Title VII's anti-retaliation provision makes it unlawful for "an employer [to] 'discriminat[e] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e-3(a).  As the D.C. Circuit has explained, once the defendant has put forth a legitimate and non-discriminatory reason for its action, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009), quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).

Unlike in the discrimination context, there are no mixed-motive retaliation claims; the plaintiff must establish that retaliation was the "but-for" cause of the adverse action in order to survive summary judgment.  *Nassar*, 133 S. Ct. at 2533.  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.*

A.   **Many of plaintiff's retaliation claims were not properly exhausted, and he cannot allege a "continuing violation" under the circumstances.**

In his opposition to the motion for summary judgment, plaintiff points to numerous instances of retaliation that were not included in the complaint.  He alleges that he was retaliated against when the agency:  denied him a within-grade step increase,[14] failed to provide an end of year appraisal in 2012, tampered with his personnel file, suspended his security clearance, sent him a letter of inquiry regarding his finances, and assigned him to a cubicle instead of an office.  Pl.'s Opp. at 9–10.

Plaintiff seems to admit that none of the allegations in the opposition were separately exhausted.  *See id.* at 10.  But he argues that the facts should be considered in support of Count III nonetheless because "separate exhaustion is not required for acts of retaliation occurring after the filing of an administrative complaint that would have come within the scope of any investigation that reasonably could have been expected to result."  *Id.*  The Court construes this argument as an attempt to claim a continuing violation under *Park v. Howard University*, 71 F.3d 904 (D.C. Cir. 1995), but it is unclear whether that doctrine has survived the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002), and plaintiff's allegations do not meet the *Park* standard in any event.

Title VII requires a plaintiff who complains of unlawful discrimination to exhaust his administrative remedies before bringing a lawsuit.  42 U.S.C. § 2000e-16(c); *see also Park*, 71 F.3d at 907 ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge.").  Thus, generally speaking, a lawsuit that flows from an EEOC charge is limited to the claims made in the charge.

---

14   Even if the claim with regard to the within-grade step increase had been exhausted, the parties now agree that plaintiff did actually receive the challenged pay increase.  Def.'s SOF ¶¶ 71–73; Pl.'s SOF ¶¶ 71–73.

Applying that principle, in 1995, the D.C. Circuit held that "[a] Title VII lawsuit following [an] EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations,'" *Park*, 71 F.3d at 907, quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994), and that would "arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.*, quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981). But, in 2002, the Supreme Court examined the statutory time limits for the initial administrative filing of a Title VII charge and held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

Some courts in this district have concluded that *Morgan* overruled the *Park* "like or reasonably related" rule, and that therefore every discrete claim of retaliation must be administratively exhausted. *See, e.g.*, *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005). Other courts have found that *Morgan* did not overrule *Park*, and that a plaintiff may still bring unexhausted claims of retaliation when the claims are "of a like kind to the retaliatory acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature." *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 136–38 (D.D.C. 2009), citing *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir. 2006). The D.C. Circuit has not yet clarified which standard applies. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (declining to reach the question of whether *Morgan* overruled the "of a like kind" rule, where the respondent's claims were unsustainable under either standard); *see also Mount v. Johnson*, 36 F. Supp. 3d 74, 84–86 (D.D.C. 2014) (discussing the differing interpretations of *Morgan* and collecting cases).

For present purposes, however, the Court need not decide which standard applies because most of plaintiff's new allegations – the denial of a within-grade step increase, the lack of an end of year appraisal in 2012, the alleged tampering with his personnel file, the letter of inquiry, and the assignment to a cubicle – do not survive under either test.  *See Payne*, 619 F.3d at 65; *see also Mount*, 36 F. Supp. 3d at 86 (declining to decide whether *Morgan* overruled *Park*, where the claims could be dismissed under the *Park* standard); *Coleman v. Johnson*, 19 F. Supp. 3d 126, 137 (D.D.C. 2014) (same result).

Plaintiff's May 11, 2012 informal EEO complaint objected to the letter of counseling that was issued on April 30, 2012, Ex. 8 to Def.'s Mot. at 40, but the complaint about the letter of counseling does not appear to be part of this case.  *See* Compl. ¶ 83.  The informal complaint also alleged that plaintiff had been placed on a PIP, and that he was subjected to "continuing . . . non-sexual harassment."  Ex. 8 to Def.'s Mot. at 40  His formal complaint, dated November 29, 2012, referenced, among other things, the following issues:  the three-day suspension, the failure of the PIP, and Andrews's selection as DAD of Analysis.  Ex. 9 to Def.'s Mot. at 46.  Then, more than a year later, on December 10, 2013, plaintiff's attorney submitted a letter to the internal EEO office alleging that plaintiff was "permanently removed" from his position, and that he "still doesn't have his SCI clearance."  Ex. 8 to Pl.'s Opp.  So to the extent that the issues set forth in either the informal or formal complaints are part of this case, the Court will assume without deciding that those issues were timely exhausted.

The Supreme Court's opinion in *Morgan* points to a finding that plaintiff failed to exhaust his administrative remedies on all of the other acts of alleged retaliation:  the denial of a within-grade step increase, the lack of an end of year appraisal in 2012, the alleged tampering with his personnel file, the letter of inquiry, and the assignment to a cubicle.  Even if the *Park* test is still

applicable in this Circuit, none of those incidents is "of a like kind" to those described in the administrative complaints, and therefore, they were not exhausted. *See Payne*, 619 F.3d at 65; *see also Mount*, 36 F. Supp. 3d at 86; *Coleman*, 19 F. Supp. 3d at 137.[15]

**B.      The failure of the PIP is not an adverse action, but the remainder of plaintiff's allegations do constitute adverse actions.**

As was the case with the discrimination claims, the agency first attacks the retaliation allegations on the grounds that they do not state adverse employment actions. The standard for what constitutes an adverse action under Title VII's anti-retaliation provision is different than the test for an adverse action under the anti-discrimination provision. *Burlington N.*, 548 U.S. at 57 (2006); *Steele v. Schaefer*, 535 F.3d 689, 695–96 (D.C. Cir. 2008). The "scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," *Burlington N.*, 548 U.S. at 67, and therefore, it does not require a materially adverse change in the terms and conditions of employment. *Steele*, 535 F.3d at 695–96; *see also Bridgeforth v. Jewell*, 721 F.3d 661, 664 n.* (D.C. Cir. 2013) (explaining that "retaliation 'encompass[es] a broader sweep of actions' than wrongful discrimination."), quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008).

But the concept is not unlimited, and actionable retaliation still does not include trivial harms: "[a]ctionable retaliation claims are limited to those where an employer causes 'material adversity,'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007), quoting *Burlington N.*, 548 U.S. at 68, and the plaintiff still must suffer some objectively tangible harm. *Holcomb*, 433 F.3d at 902, quoting *Forkkio*, 306 F.3d at 1130–31. The Supreme Court has defined material adversity

---

15      To the extent that plaintiff is arguing that each exhausted discrete act in his complaint should be viewed as a single continuing act of unlawful retaliation, he relies solely on temporal proximity to prove that theory, and he cannot overcome the legitimate and non-discriminatory reasons proffered by the agency, as the Court will discuss.

in the retaliation context as an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68, quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).  It is an objective standard that is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

Plaintiff's claim that he was retaliated against by being placed on a PIP does not state a materially adverse employment action.  Plaintiff admits that he faced no adverse consequences, even after the agency found that he failed the PIP.  Def.'s SOF ¶ 64; Pl.'s SOF ¶ 64.  Since there was no material adversity, and no objectively tangible harm, this issue cannot be the basis of a retaliation claim.

However, the remaining circumstances – the two suspensions, the non-selection for the position of DAD of Analysis,[16] the temporary revocation of plaintiff's security clearance, and the reassignment to a non-supervisory position – are sufficiently adverse to require the Court to go on to the merits of plaintiff's retaliation claim, for the reasons explained previously.

**C.    Plaintiff cannot show that the suspensions were retaliatory, nor can he establish that the suspensions were pretextual.**

Plaintiff asserts that the two suspensions were the result of unlawful retaliation.  Compl. ¶¶ 83(b), (e).  Defendant argues that plaintiff cannot prove that the suspensions were retaliatory, and it identifies a break in the chain of causation:  in each instance, both the recommendation to suspend and the final decisions were made by agency officials who were not aware of plaintiff's prior EEO activity.  *See* Def.'s Mem. at 26, 29.  But while is true that neither of the ultimate

---

16    Given the lack of clarity surrounding this particular issue, the Court will again assume without deciding that this non-selection constitutes an adverse employment action.

decision makers – Frank Reeder and Robert Bentall – knew of plaintiff's prior EEO activity, that does not automatically end the inquiry.[17]

### 1.      The June 2012 suspension

To make out a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) that "a causal link connects the two." *Bernanke*, 557 F.3d at 677.   At the summary judgment stage, however, where the employer has produced a legitimate, non-discriminatory reason for its action, "the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 678, quoting *Brady*, 520 F.3d at 494.   Instead, the dispositive question becomes whether the plaintiff produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason for the adverse action, and that the employer actually retaliated against the plaintiff. *Brady*, 520 F.3d at 495.   In assessing this issue, the court is to consider "'all the evidence,' which includes not only the prima facie case but also the evidence

---

17      Frank Reeder was the deciding official for the June 2012 suspension, which was memorialized in a Final Decision letter dated June 27, 2012.   Def.'s SOF ¶¶ 87–88; Pl.'s SOF ¶ 87–88.   Reeder averred in his response to the interrogatories propounded by the EEO office that he was not aware of plaintiff's participation in the EEO process.   Def.'s SOF ¶ 117; Ex. 5 to Def.'s Mot. [Dkt. # 18-2] at 14, 20.   Plaintiff points to the fact that "he told Mr. Reeder he was going to file an EEO complaint on June 27, 2012."   Pl.'s SOF ¶ 117, citing Pl.'s Interrogs. at 24.   The page cited by the plaintiff, though, does not support that proposition; in fact, that page does not discuss any conversations with Reeder at all.   In another interrogatory response, plaintiff does state that he told Reeder about his EEO activity during a meeting, but he dates that conversation as taking place on June 30, 2012 when he was handed a written copy of the final decision dated June 27, 2012. Pl.'s Interrogs. at 10.   So plaintiff has not created a genuine issue of material fact on whether Reeder knew of his prior EEO activity at the time he made the final decision to suspend plaintiff on June 27, 2012. *See* Def.'s SOF ¶ 87; Pl.'s SOF ¶ 87.

The January 2013 suspension decision was made by Robert Bentall.   When plaintiff was suspended in January 2013, the suspension that the DAAP Panel recommended was for fourteen days, but the deciding official, Bentall, mitigated the suspension to seven days.   Def.'s SOF ¶¶ 94, 98; Pl.'s SOF ¶¶ 94, 98. There is no evidence in the record to suggest that Bentall had knowledge of plaintiff's prior EEO activity.

the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Bernanke*, 557 F.3d at 677, quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

If one starts with the *prima facie* case related to the three day suspension, plaintiff has shown that he engaged in protected activity:  he complained to his internal EEO office on May 11, 2012 about the Letter of Counseling and other steps taken by Andrews.  Ex. 8 to Def.'s Mem. at 40.

Plaintiff has presented no direct evidence of retaliation; his claim is based solely upon the temporal proximity of his initial EEO report to the suspension that resulted from Andrews's May 2012 memorandum to the Employee and Labor Relations Department.  *See* Pl.'s Opp. at 1 (arguing that "[t]he record evidence reveals that shortly after Mr. Duncan complained about discrimination, he was . . . suspended from duty without pay for three days.").[18]

But there was a significant intervening event:  plaintiff's unexcused absence on May 14.

On May 11, 2012, Andrews assigned plaintiff a project, and she gave him until Monday, May 14, 2012 to complete it.  *See* Def.'s SOF ¶¶ 78–81.  While plaintiff seeks to minimize the significance of the entire incident, he admits that he took unscheduled leave on that Monday, and therefore did not complete the assignment. *See id.*; Pl.'s SOF ¶¶ 78–81.

Shortly thereafter, on a date that is not revealed in the record, Andrews submitted a memorandum to ELR recounting the facts surrounding plaintiff's failure to complete the project

---

18      While it is true that temporal proximity can "support an inference of causation . . . where the two events are very close in time," *Hamilton*, 666 F.3d at 1357, quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007), and while the time that elapsed between plaintiff's informal EEO report and the decision to suspend him was short, the D.C. Circuit has made clear that courts should consider "the specific facts of each case to determine whether inferring causation is appropriate."  *Id.* at 1358.

as assigned, the importance of the deadline, and the burdens plaintiff's actions placed on his co-workers.  *See* Ex. 27 to Def.'s Mot. [Dkt. # 18-2] at 259–62.  The memorandum included no recommendation about whether plaintiff should face any sanction, and it transmitted statements of the other individuals involved to establish the facts.  *Id.*  ELR then submitted the facts to a DAAP Panel made up of three supervisory officials other than Andrews.  Def.'s SOF ¶ 83; Pl.'s SOF ¶ 83; *see* Def.'s SOF ¶ 75; Pl.'s SOF ¶ 75.  The panel considered the matter and on June 1, 2012, it notified plaintiff that it recommended a five day suspension.  Def.'s SOF ¶ 84; Pl.'s SOF ¶ 84; Ex. 26 to Def.'s Mot. at 249.  Plaintiff then prepared a detailed refutation and submitted it to the reviewing official charged with making the final decision, Frank Reeder.  Def.'s SOF ¶ 86; Pl.'s SOF ¶ 86; Ex. 26 to Def.'s Mot.  Reeder's decision was issued about three weeks later, on June 27, 2012.  Ex. 26 to Def.'s Mot. at 249–52.  So approximately a month and a half elapsed between plaintiff's EEO complaint and the ultimate decision to suspend him for three days.

Defendant asserts a legitimate and non-retaliatory reason for the suspension:  that plaintiff failed to "ensure timely completion of the" project, and that he "fail[ed] to take responsibility" for not completing the project in a timely manner.  Def.'s Mem. at 27–28 (emphasis omitted).  Once an employer asserts a legitimate and non-retaliatory reason for its action, the burden shifts to the plaintiff to satisfy his burden to establish an inference of pretext, and he can only survive summary judgment if he also provides sufficient evidence to show that retaliation was the "but for" cause of the alleged adverse action.  *Nassar*, 133 S. Ct. at 2533.  A Title VII plaintiff cannot survive summary judgment by asserting that his employer made the wrong decision.  Rather, he must raise a genuine dispute over the employer's honest belief in its proffered explanation.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  "A plaintiff can meet this burden by

casting doubt on the objective validity of the employer's explanation."  *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016).

Here, plaintiff attempts to show pretext by pointing to what he identifies as "inconsistencies" in defendant's proffered reasons.  Pl.'s Opp. at 16–19, citing *McDonnell-Douglas*, 411 U.S. at 805.  Plaintiff contends that the agency's explanation must be false because Reeder "failed to adhere to official leave policy and suspended Mr. Duncan despite acknowledging that he was on leave [and] could not be penalized for work not completed while on leave . . .[,] also suspended Plaintiff despite finding he did not violate any established policies[,] . . . [and] he ignored the fact that Stephanie Andrews falsified documentation."  *Id.* at 19.

But this mischaracterizes Reeder's findings.  Reeder made no finding that plaintiff "could not be penalized for work not completed while on leave," and he made no finding that plaintiff "did not violate any established policies."  To the contrary, the decision letter noted that Reeder specifically "considered that [plaintiff was] on unscheduled annual leave, requesting that leave the morning of May 14, 2012, following an automobile mishap involving a flat tire and a brake issue."  Ex. 26 to Def.'s Mot. at 250.  But the decision maker went on to conclude that "[w]hile these circumstances are unfortunate, this is not an uncommon occurrence and hardly catastrophic."  *Id.*

In any event, plaintiff's argument that he could not have been required to work while he was getting his car repaired is beside the point.  Plaintiff was not unable to communicate with his coworkers and chain of command to ensure that the project would be completed on time, and it was his failure to communicate, and not his failure to complete the work himself,  that prompted the suspension.  *Id.* at 250.  Because plaintiff has not put forth any evidence to "cast[] doubt on the objective validity of the employer's explanation," *Morris*, 825 F.3d at 671, he cannot show pretext.

Defendant also focuses on the adequacy of the *prima facie* case that is part of the evidence to be considered at this stage, and it argues that the chain of causation was cut off when Andrews sent her memorandum up the chain.   There is no dispute that the other agency officials involved, including the final decision maker, had no knowledge of plaintiff's EEO report.   But plaintiff asserts that, because it was Andrews who "provided the sole evidence used to commit these employment actions and thus was the sole influence for the decision-makers to . . . suspend [plaintiff] without pay," she should be considered the "decision-maker."   Pl.'s Opp. at 16, citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). While plaintiff does not supply any additional legal analysis beyond the citation, he appears to be invoking the "cat's paw" theory of causation in employment discrimination cases that was discussed in *Staub*. 562 U.S. at 415;[19] *see also Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015).   According to plaintiff, even if the final decision makers were not motivated by unlawful intent, defendant can be liable if retaliatory conduct on Andrews's part set off the sequence of events and influenced the ultimate decision to suspend him.[20]

---

[19]     The Supreme Court in *Staub* explained that the metaphor of "cat's-paw" discrimination is a reference to one of Aesop's fables, in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.   After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing."  562 U.S. at 415 n.1.

[20]     There is a genuine dispute of material fact with regard to whether even Andrews knew of plaintiff's EEO activity.  Plaintiff made his first report to an EEO Counselor on May 11, 2012, and shortly thereafter, Andrews transmitted the information concerning plaintiff's absence on May 14, 2012 to ELR.  There is no evidence in the record that the report to the counselor was brought to Andrews's attention after it was made.   Andrews testified that she first learned of plaintiff's protected activity on August 28, 2012, when an EEO counselor contacted her to rebut plaintiff's allegations.  Def.'s SOF ¶ 120; Andrews Dep. [Dkt. # 27] at 56:11–21.  But plaintiff contends that, on April 30, 2012, he told Andrews that he planned to file an EEO complaint against her.  *See* Def.'s SOF ¶ 121; Pl.'s SOF ¶ 120.  Andrews has disputed that testimony; she testified that plaintiff did not tell her that he intended to file an EEO complaint on that date.  Andrews Dep. at 45:3–5.  But even assuming that Andrews knew of the EEO complaint, plaintiff cannot show that she acted with the requisite animus.

In *Staub,* the Supreme Court described the circumstances under which the discriminatory animus of the employee who set the events in motion, but was not the ultimate decision maker, could be found to be "a motivating factor" in an adverse employment decision.[21]  To prove a causal connection on a *Staub* "cat's-paw" theory, the plaintiff must demonstrate that "[1] a supervisor performs an act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate [adverse] action."  *Staub,* 562 U.S. at 422 (emphasis in original); *see also Morris,* 825 F.3d at 668 (applying *Staub* to the Title VII context).  Here, there is scant evidence to support any of three aspects of this test.

---

21      It is noteworthy that the test arises in the context of discrimination.  *Staub,* 562 U.S. at 423. *Staub* involved discrimination based on military service in violation of 38 U.S.C. § 4311(a), and the Court took pains to emphasize that it was utilizing a proximate cause analysis because liability under the Uniformed Service Employment and Reemployment Rights Act of 1994 is premised upon a statutory requirement that discrimination be "*a*" motivating factor.  *See* 562 U.S. at 419– 20 ("We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias 'remote' or 'purely contingent.'  The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.").  But while Title VII discrimination claims are premised on similar statutory language and may therefore be predicated on a showing that discrimination was *a* cause of the adverse action, the Supreme Court has stated in *Nassar* that based on the text and structure of the statute, including the use of the word "because" in section 2000e-3(a), a plaintiff must show that retaliation was the "but for" cause of the adverse action to survive summary judgment on a retaliation claim.  133 S. Ct. at 2533–34.  This raises the question of whether and how *Staub* is to be applied in a retaliation case in the wake of *Nassar.*  The D.C. Circuit has yet to address that issue directly, and the available precedent indicates that this Court should move forward to analyze the facts under the *Staub* rubric.  *See Walker,* 798 F.3d at 1095–96 (applying the "cat's paw" theory to retaliation claims).  However the Fifth and Sixth Circuits have concluded that, to succeed on a retaliation claim under a "cat's paw" theory, a plaintiff must show but-for, not proximate, causation.  *Zamora v. City of Houston,* 798 F.3d 326, 332 (5th Cir. 2015); *Seoane-Vasquez v. Ohio State Univ.,* 577 F. App'x 418, 428 (6th Cir. 2014).  Plaintiff is unable to do that in this case.  But since the facts in this case do not establish that any retaliatory intent harbored by Andrews was even *a* cause underlying the decision to suspend, the Court will does not premise its decision on the absence of the "but for" proof.

a.   <u>Plaintiff has not come forward with sufficient evidence to show that Andrews was motivated by an intent to retaliate.</u>

As other courts have noted, it is difficult to harmonize the cat's paw approach with the traditional pretext-based analysis under *McDonnell Douglas*. *See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) (acknowledging, but not resolving, the "uneasy marriage" between the two doctrines); *Seoane-Vazquez*, 577 F. App'x at 427 n.3. But there is some guidance available in the *Morris* decision, in which the D.C. Circuit explained at the outset that it would assess the plaintiff's claim using the *McDonnell Douglas* framework, and the plaintiff was alleging that the adverse decision in question had been influenced by her immediate supervisor's bias under a *Staub* theory. 825 F.3d at 668–69. When the Court of Appeals considered the first *Staub* factor – whether the supervisor had been motivated by discriminatory bias when she made her recommendation – the Court looked at all of the evidence to determine whether a reasonable jury could find that the non-discriminatory reason proffered for the supervisor's action was pretextual. *See id.* at 668–72.

So the Court will consider "all of the evidence . . . which includes . . . the prima facie case," *Bernanke*, 557 F.3d at 677, to assess whether Andrews performed a retaliatory act, and whether the legitimate reason Andrews identified for her report to ELR was pretextual. And here, the evidence of retaliatory intent, even on her part, is very thin.

Plaintiff points to no direct evidence of an intent to retaliate on Andrews's part – his only evidence is the inference to be drawn from the timing of her memorandum. But the evidence also includes the fact that Andrews sent her memorandum to the employee relations office soon after plaintiff's absence on May 14, 2012 and it addressed only one issue: plaintiff's conduct on May 14, 2012, and the disruption it caused in the office. Andrews did not utilize the opportunity to complain about plaintiff's conduct more generally, and she did not make any recommendation

concerning a potential sanction.  This suggests that plaintiff's own conduct was at least *a* – if not *the* – proximate cause of her action.

Moreover, while plaintiff asserts that he told Andrews in late April that he intended to lodge an EEO complaint, there is no evidence that Andrews was actually informed of plaintiff's informal report to the counselor between May 11, 2012, and the date of her memo.  So even if one gives plaintiff the benefit of the disputed allegation that Andrews was warned that there would be an EEO complaint at some point in the future, there is no evidence that she had any knowledge that he had actually engaged in protected activity at the time she prepared her memorandum.

Finally, plaintiff has come forward with no evidence that would demonstrate that Andrews's concerns about plaintiff's absence and his failure to ensure the completion of a time-sensitive project were merely pretextual; while he seeks to minimize the importance of the day's events, he does not deny them.  And the statements of other employees attached to Andrews's memorandum reflect that her concerns were shared.  *See* Ex. 7 to Pl.'s Opp. [Dkt. # 21-7] at 4, 6, 8–9, 12.

In sum, plaintiff relies solely on the fact that the Andrews memorandum followed his EEO report closely in time to satisfy the first *Staub* factor, so the cat's paw theory is quite weak from the outset.  *See, e.g.*, *Hamilton*, 666 F.3d at 1359 ("[P]ositive evidence *beyond mere proximity* is required to defeat the presumption that the proffered explanations are genuine."), quoting *Woodruff*, 482 F.3d at 530.  But the impact of any inference that might arise from the temporal proximity is dulled by plaintiff's own intervening conduct, the focused nature of the Andrews report, the unspecific nature of the evidence of her alleged knowledge, and most important, the absence of any evidence on what is supposed to be the dispositive question at this stage:  whether the supervisor's stated reasons for taking action were pretextual.  The Court finds, therefore, that

plaintiff has not come forward with sufficient evidence to enable a reasonable juror to conclude that Andrews acted with the required intent.[22]

> b.    A reasonable juror could conclude that Andrews intended her report to ELR to cause an "adverse action."

If plaintiff could prove that Andrews was motivated by retaliatory intent, the Court would next be required to consider whether Andrews intended her report to ELR to cause an adverse action.  *Staub*, 562 U.S. at 422.  Andrews provided a factual summary of the allegations – that plaintiff failed to timely complete the assignment – to ELR.  Ex. 27 to Def.'s Mot. at 259–63. Andrews testified that she was not aware of the information upon which ELR relied in its presentation to the DAAP Panel, and that she had no input on Reeder's ultimate decision to mitigate the recommended suspension from five days to three days.  Andrews Dep. at 89:14–90:7.

In *Morris*, the D.C. Circuit concluded that *Staub*'s second prong was "easily met" where the tainted supervisor "recommend[ed] that [the employee] be suspended," because the recommendation "was clearly intended to cause such a suspension."  825 F.3d at 668.  In this case, Andrews's memorandum to ELR did not include a recommendation of any kind, let alone a recommendation that plaintiff should be suspended.  Ex. 27 to Def.'s Mot.  But because a reasonable juror could infer that Andrews sent the memorandum to ELR with the knowledge that *some* adverse action could follow, the Court finds that plaintiff can just meet his burden under the second prong of the *Staub* test.

---

22    Following the D.C. Circuit's approach in *Burley*, 801 F.3d at 297–98 (refraining to proceed to steps two and three of the cat's paw analysis because the plaintiff failed to raise a reasonable inference of discrimination), the Court's analysis could stop here.

c.   Plaintiff cannot establish that Andrews's allegedly retaliatory act
was the proximate cause of his suspensions.

In analyzing the third factor, the Supreme Court in *Staub* recognized that an impartial

decision maker may be influenced by the discriminatory intent of the supervisor who set the wheels

of employee discipline in motion.  562 U.S. at 413.  The Court held that such an employer may

not avoid liability if the impartial decision maker "takes [] into account" a biased, retaliatory report,

"without determining that the adverse action was, apart from [the initiator's] recommendation,

entirely justified."  *Id.* at 421.  So, if the biased supervisor "played a role informing the [final

decision maker] about [plaintiff] and [his] conduct, the [final decision maker] becomes 'the

conduit of [his] prejudice – his cat's paw.'"  *Walker*, 798 F.3d at 1095, quoting *Griffin v. Wash.

Convention Center*, 142 F.3d 1308, 1311–12 (D.C. Cir. 1998).

But the Supreme Court also made clear that a plaintiff cannot make out a claim if the

impartial decision maker makes an independent determination that adverse action is warranted for

reasons "unrelated to the [non-decision maker's] original biased action."  *Staub*, 562 U.S. at 421;

*see also Walker*, 798 F.3d at 1095 ("If the [deciding official] was independent of and insulated

from [the biased supervisor's] influence, that break in the chain would have rendered inoperative

any illicit motive [the biased supervisor] might have had regarding the discipline.").

In this instance, Andrews sent a memo to ELR, ELR convened an independent three

member panel, the three member panel made its own recommendation, plaintiff filed a written

submission in response to the recommendation, and yet another agency official made the final

decision based on his assessment of not only of the Andrews memo and the panel's

recommendation, but plaintiff's detailed response.  The Court finds that all of those circumstances

were sufficient to cut off any taint that colored the allegedly retaliatory initial referral, which

– given the paucity of evidence on that point – was barely a tinge, if that.

First of all, Reeder's statements make it clear that he was completely independent of Andrews's influence.   In assessing the proposed suspension, Reeder did not simply review Andrews's account.   He made the decision to utilize a "Douglas Factor Checklist," an internal agency mechanism for weighing aggravating and mitigating factors in arriving at an appropriate sanction.   Reeder completed it, assessing the thirteen factors, and providing written comments as to each factor himself; neither Andrews nor the DAAP panel had submitted one.   *See* Ex. 30 to Def.'s Mot. [Dkt. # 18-2] at 276–314.   And in the discussion of the Douglas factor of "[t]he effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties," Reeder notes:

> I have not interviewed the employee's supervisor [Andrews] and do not know if there has been a loss of confidence in the employee's ability to perform his duties at a satisfactory level.  However, if I were the employee's supervisor I would certainly question the employee's performance during this event and would closely monitor his future performance – especially given his level of responsibility in the organization.

*Id.* ¶ 5.  This observation reflects that Reeder was "independent" and "insulated" from Andrews's influence, which breaks the causal chain.  *Walker*, 798 F.3d at 1095.

A review of Reeder's final decision in its entirety further supports the conclusion that he took an independent view of the evidence.   Reeder conducted a careful review of the facts, and his decision includes something that was absent from the Andrews memo or the DAAP recommendation:   the detailed consideration of each of the arguments plaintiff advanced in his own defense and in opposition to the proposed suspension.   Reeder found "that the reason and underlying specification has been proven," and he "sustain[ed] the charge."  Ex. 26 to Def.'s Mot. at 249.   But he did not simply rubberstamp the recommendation that had been submitted to him. He stated: "[a]fter giving full and impartial consideration to the circumstances surrounding the proposed action, and weighing your actions against the *Douglas* Factors, it is my belief that a lesser

penalty will suffice to impress upon you the seriousness of your actions." *Id.* at 250.  Plaintiff has

not pointed to anything that would undermine this evidence of Reeder's independence.

While *Staub* recognizes that a biased supervisor's report "may remain a causal factor" in

an employment action, it specifically incorporates that "traditional tort-law concept of proximate

cause" in reaching its holding.  562 U.S. at 420–21.  But even under a proximate cause analysis,

causation can be cut off.

> Every event has many causes. . . and only some of them are proximate, as
> the law uses that term.  So to say that one event was a proximate cause of
> another means that it was not just any cause, but one with a sufficient
> connection to the result . . . . A requirement of proximate cause thus serves
> . . . to preclude liability in situations where the causal link between conduct
> and result is so attenuated that the consequence is more aptly described as
> mere fortuity.

*Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014), citing *Exxon Co., U.S.A. v. Sofec*, 517

U.S. 830, 838–39 (1996).

In this case, the connection between Andrews's initial report and Reeder's ultimate

decision was too attenuated for any improper motivation of hers to be found to be a proximate

cause of the suspension – there were multiple levels in between.  Andrews's report, which merely

reported facts and did not include any "recommendation," was delivered to ELR.  Def.'s SOF ¶ 82;

Pl.'s SOF ¶ 82.  ELR then convened a DAAP Panel, a panel of three independent high-level DHS

employees.  *See* Def.'s SOF ¶¶ 75–76; Pl.'s SOF ¶¶ 75–75.  The Panel evaluated the evidence and

determined whether the evidence supported a sanction.  Def.'s SOF ¶¶ 83–84; Pl.'s SOF ¶¶ 83–

84.  If that was not enough to eradicate any improper motivation behind the referral, plaintiff then

had a full opportunity to add to the body of material that was being passed up the chain by

submitting any facts and arguments he wished to have considered.  Def.'s SOF ¶ 86; Pl.'s SOF

¶ 86.  And finally, Reeder reviewed the Panel's recommendation, along with plaintiff's rebuttal,

applied the *Douglas* factors, drew his own conclusion, and arrived at a sanction that was less severe

than what the panel had recommended.  Def.'s SOF ¶¶ 87–88; Pl.'s SOF ¶¶ 87–88.  So, even if the timing of events gives rise to an inference that Andrews had some retaliatory animus, the facts of this case fall squarely within the circumstance described in *Staub* in which the "cat's paw" causation  can be cut off:  an "independent investigation . . . determin[ed] that the adverse action was, apart from the supervisor's recommendation, entirely justified."  562 U.S. at 421.

Thus, the Court finds that no reasonable jury could conclude that an intent to retaliate by Andrews proximately caused the June 2012 three day suspension, and summary judgment will be granted in favor of the defendant on this retaliation claim.

### 2.    The January 2013 suspension

Plaintiff filed his formal complaint of discrimination on November 30, 2012.  Ex. 9 to Def.'s Mot. at 44–48.  He seems to argue that his second suspension was in retaliation for his formal complaint.  *See* Pl.'s Opp. at 1 ("Further evidence reveals that when Mr. Duncan continued to complain about discrimination[,] the Agency . . . suspended him from duty for seven days.").  Plaintiff points to no direct evidence of retaliatory intent, but the Court may infer a causal connection between protected activity and an adverse employment action on a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985); *see also Holcomb*, 433 F.3d at 903.  But here, plaintiff cannot show causation in that manner because the adverse employment actions did not occur close in time to the protected activity, and plaintiff has no other evidence of retaliatory intent.

Courts in this district "often follow[] a three-month rule to establish causation on the basis of temporal proximity alone."  *McIntyre*, 460 F. Supp. 2d at 133; *see Clark Cty. Sch. District v. Breeden*, 532 U.S. 268, 273 (2001) (temporal proximity between employer's knowledge of protected activity and adverse employment action must be "very close").

48

The proposed suspension drafted by the DAAP Panel is dated October 17, 2012, *see* Ex. 31 to Def.'s Mot. at 321–28, and it recounts plaintiff's unprofessional conduct that took place in April, July, and September of 2012.  So if plaintiff's claim is that the seven day suspension was retaliation for the formal complaint, no reasonable juror could conclude that the timeline supports an inference of causation, since plaintiff's formal complaint was filed a month *after* the DAAP Panel's proposed suspension.  And if plaintiff is arguing instead that either the DAAP Panel recommendation or the final January 2013 suspension decision was in retaliation for his initial, informal EEO report on May 10, 2012, he cannot point to the temporal proximity that would create a causal connection.

Moreover, plaintiff has no evidence that either the DAAP Panel members or the final decision maker knew about the protected activity.  But what if, under the cat's paw theory that is merely hinted at in plaintiff's opposition, plaintiff is asking the Court to focus on the temporal proximity between the date Andrews was officially informed that plaintiff had filed an EEO report – on August 28, 2012[23] – and the date of Andrews's second report to ELR that led to the January 2013 suspension?  The date of the report that led to the suspension is not in the record, but it had to be before the DAAP Panel made its October 17, 2012 recommendation.  So there is some evidence of temporal proximity, but it is thin, in part due to plaintiff's failure to put Andrews's memorandum to ELR for the second suspension into the record.  But the Court will go on to consider whether plaintiff can show that if Andrews had an intent to retaliate, she served as the "cat's paw" that led to Bentall's decision to suspend him for seven days.

---

23      *See* Def.'s SOF ¶ 120; Andrews Dep. at 56:11–21 [Dkt. # 27].

a.   Plaintiff cannot show that Andrews acted with discriminatory animus.

Based on *Morris*, it appears that in order to show that Andrews acted with discriminatory animus under a *Staub* theory at the summary judgment stage, plaintiff must show that defendant's legitimate and non-discriminatory reason was merely a pretext for discrimination.  *See Morris*, 825 F.3d at 668–72.  Based on the proposed suspension, the DAAP Panel recommended that plaintiff be suspended for legitimate and non-discriminatory reasons – because he failed to follow instructions, because he was absent without leave on September 12, 2012 and then lied about his absence, and because he acted unprofessionally.  *See* Ex. 31 to Def.'s Mot. at 321.  And Bentall, in his final decision, upheld several of those findings.  He "decided to sustain Reason 2," finding that plaintiff was "absent without leave . . . on September 12 2012."  *Id.* at 316.  He noted that "this offense [was] the least serious of [plaintiff's] misconduct because [plaintiff's] failure to properly request leave and absence did not have a significant adverse impact on the operation of the Analysis Division."  *Id.*   Bentall also found that plaintiff made "misstatements or misrepresentations regarding [his] leave on September 12, 2012," and so he "sustain[ed]" that charge, as well.  *Id.*   Bentall considered those misrepresentations to be "the most serious of the sustained offenses because it undermines [plaintiff's] credibility."  *Id.*   And Bentall concluded that plaintiff was "argumentative in [his] July 6, 2012 communication with [his] supervisor," so he "sustain[ed] Reason 4, specification 4."  *Id.* at 317.  Bentall decided not to sustain "any of the remaining charges or specifications."  *Id.*

Plaintiff seizes on this mixed verdict and argues that he can show pretext because "Mr. Bentall found that at least some of the information provided by Ms. Andrews was not verified."  Pl.'s Opp. at 19.  But plaintiff again overstates the supervisor's findings:  Bentall simply concluded that he "d[id] not feel the evidence is adequate to support the remaining specifications by a

preponderance of the evidence."  Douglas Factor Checklist, Ex. 32 to Def.'s Mot. [Dkt. # 18-2] at

330.  So while Bentall did not sustain some of the charges against plaintiff, he did not make a

finding that Andrews provided "unverified" information; he only found that the evidence presented

was insufficient.  At bottom, neither party disputes the underlying truth of the allegations that

Bentall sustained:  that plaintiff was AWOL, that he lied about it, and that he was disrespectful to

his supervisor.  Because there is no direct evidence that Andrews sought revenge and no evidence

of pretext, plaintiff's evidence of Andrews's retaliatory intent, which seems to rely on temporal

proximity and little else, is quite thin.[24]

        b.    <u>There is evidence in the record from which a reasonable juror could<br>infer that Andrews intended to cause an adverse action.</u>

With regard to the January 2013 suspension, neither side has put Andrews's complaint to

ELR into the record – for that matter, neither side has put forth any evidence that Andrews was

the one that complained to ELR at all.  All that is before the Court is the DAAP Panel's proposed

suspension, which indicates that a number of records, including emails drafted by Andrews, were

attached to the original.  *See* Ex. 31 to Def.'s Mot. at 326 (enclosures include an "August 1, 2012

email string from DAD Andrews entitled Duncan Conduct Issues.").  A reasonable jury could

conclude, especially in light of plaintiff's prior suspension, that by documenting Duncan's

"conduct issues," Andrews was intending that some adverse action would follow.

        c.    <u>Plaintiff cannot show causation.</u>

Once again, this disciplinary action went through multiple levels of independent review.

So as with the June 2012 suspension, the causation was highly attenuated.  The decision maker,

Bentall, carefully weighed the evidence, including plaintiff's rebuttal, and concluded that while

---

24      Pursuant to the D.C. Circuit's analysis in *Burley*, 801 F.3d at 297–98, the Court could again
stop here.

some of the allegations merited sanction, others had not been proven.  Ex. 31 to Def.'s Mot.  In other words, the record reflects that the decision maker exercised his own judgment based on his own evaluation of the salient facts, which included all of the evidence and arguments that plaintiff chose to put forward.  Thus, even if the test for retaliation in this case is the proximate cause test of *Staub* (was it "a" motivating factor), and not the but-for test from *Nassar*, there is no factual basis for a reasonable juror to conclude that Andrews's report proximately caused the seven day suspension.

Considering all of the evidence, the Court concludes that no reasonable juror would find that Andrews's actions were retaliatory.  Plaintiff has only put forth temporal proximity and nothing more in support of his argument that the January 2013 suspension was pretextual, but in light of the fact that he admits that he engaged in the conduct that led multiple independent reviewers to call for his suspension, he cannot show that the decision was infected with Andrews's alleged bias.

> **D.    Plaintiff has offered no evidence to rebut the legitimate and non-discriminatory reasons for his non-selection as Deputy Assistant Director of Analysis.**

Plaintiff also alleges that his non-selection as Deputy Assistant Director of Analysis was retaliatory. Compl. ¶ 83(d).  Defendant has put forward a legitimate and non-discriminatory reason for why plaintiff was not hired for this position:  he never applied.  Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32.  So the burden shifts to the plaintiff to establish that this explanation was merely pretext for a retaliatory act.  *McDonnell Douglas*, 411 U.S. at 803; *Holcomb*, 433 F.3d at 899.  And while plaintiff has tried to make the case that he did not need to apply because the position he already

had was materially the same, he has offered no evidence in support of that theory.[25]   Since

plaintiff's opposition to the motion for summary judgment points to no evidence that the agency's

stated reason for hiring Andrews instead of plaintiff was pretextual, the agency is entitled to

judgment as a matter of law on this issue.

> **E.     Plaintiff has not rebutted the legitimate and non-discriminatory reasons for causing an investigation into plaintiff's security clearance.**

Plaintiff contends that Andrews retaliated against him in December 2012 by causing him

to be "investigated based on [the] false allegation[]" Compl. ¶ 83(f) that he had "disseminated a

finished intelligence product that contained confidential informant information that Plaintiff had

been directed to redact." Def.'s SOF ¶ 102.  The agency contends its legitimate non-discriminatory

reason was that Andrews honestly believed that plaintiff had engaged in misconduct, and that the

decision to report plaintiff to the Personnel Security Unit was not only made by Andrews, but was

authorized by Reeder.  *See* Def.'s SOF ¶¶ 103–04.

Plaintiff makes the following arguments to rebut that legitimate and non-discriminatory

reason:

> Defendant ignores the fact that the security violation that Ms. Andrews reported involved Mr. Duncan discussing classified information with a confidential informant that he was working with.  This fact shows Stephanie Andrews falsely accused him of disseminating finished intelligence product knowing that he was not the one that disseminated the product and that the information was not disseminated to anyone that did not have the need to know.  In addition, Ms. Andrews knew it was not a security violation but still intentionally reported this to ICE Personnel Security Unit knowing that it would at least result in the temporary suspension of his security clearance.

Pl.'s Opp. at 19.  First of all, it bears repeating that, other than temporal proximity to his protected

activity, plaintiff has not adduced any evidence to show that Andrews acted with a retaliatory

---

25      Indeed, while plaintiff has testified that he believed the duties of the two positions were the same, *see* Pl.'s Dep. at 43:24–44:7, he could not recall whether he had ever even read the vacancy announcement for the DAD of Analysis position. *Id.* at 68:5–17.

motive.  Rather, it appears that plaintiff is attempting to meet the burden to show that the employer's decision was objectively incorrect.  To meet this burden, he must raise a genuine dispute over the employer's honest belief in its proffered explanation.  *See Fischbach*, 86 F.3d at 1183.  "A plaintiff can meet this burden by casting doubt on the objective validity of the employer's explanation."  *Morris*, 825 F.3d at 671.

To meet this burden, plaintiff points only to his own interrogatory responses:

> On December 6, 2012, I was presented with a memorandum indicating that my access to classified national security information was suspended immediately. . . .

> On February 7, 2013, I was informed by Office of Professional Responsibility (OPR) fact finder Derrick Swift that I was . . . being investigated for unauthorized disclosure of law enforcement sensitive information.  It was clear based on the investigation that Stephanie Andrews was responsible for filing these false allegations.  She also contended that I was a counterintelligence threat.  It was also clear that Stephanie Andrews had no other basis for filing these false allegations other than pure harassment and retaliation for filing an EEO complaint and to completely ruin my career and to destroy me as a person. . . .

> The fact that Stephanie Andrews and ICE senior management would go to such great lengths to abuse the OPR investigatory process to further their harassment in retaliation for my filing an EEO complaint demonstrates the insidious nature of their desire to completely humiliate me and destroy my career.  To be branded as someone who cannot be trusted with national security information, traitor to my children and my country was unbearable. Stephanie Andrews and ICE were so desperate to get rid of me that nothing was off limits.  Stephanie Andrews's actions were dishonest, retaliatory, and a clear abuse of OPR investigative resources.

Pl.'s Interrogs. at 16–18.  While it is true that even self-serving affidavits can create genuine issue of fact on summary judgment, *see Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016), plaintiff's interrogatory answers are not factual – they are simply his conclusions.  A plaintiff must offer more than "purely conclusory" allegations of improper bias at this stage.  *See Holcomb*, 433 F.3d at 899.  Even if one credit's plaintiff's version of events, as the Court must do at this point, *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016), quoting *Anderson*, 477 U.S. at 255, plaintiff

has offered no *evidence* to "cast[] doubt on the objective validity of the employer's explanation." *See Morris*, 825 F.3d at 671.  Plaintiff's conclusory allegations that "it was clear" that Andrews filed false reports, combined with the lack of any evidence to show that Andrews acted with unlawful intent, are insufficient to rebut the legitimate and non-retaliatory reason for the investigation into his security clearance.

### F.   Plaintiff cannot show that his re-assignment to a non-supervisory position was retaliatory.

Finally, plaintiff asserts that he was re-assigned to a non-supervisory position in retaliation for protected activity.  Compl. ¶ 83(g).  Putting aside the question of whether this was an adverse action, defendant claims that plaintiff cannot prove causation – because Bentall and Reeder were the decision makers who decided to re-assign plaintiff, and neither knew of his protected activity – and that the agency had a legitimate and non-discriminatory reason for re-assigning plaintiff:  to remove plaintiff from the repeated and noticeable conflicts that had developed between plaintiff and his supervisor, Ms. Andrews.  *See* Def.'s SOF ¶ 115; Pl.'s SOF ¶ 115.

Plaintiff admits that Andrews had nothing to do with his reassignment, and he admits that it was Reeder, his second-line supervisor, and Bentall, the Chief of Staff, who orchestrated the move.  *See* Def.'s SOF ¶ 108; Pl.'s SOF ¶ 108.  So plaintiff's claim of retaliation again appears to rest solely on temporal proximity.  Even crediting plaintiff's version of events – that Reeder learned of plaintiff's protected activity in June of 2012, Pl.'s SOF ¶ 117, plaintiff cannot establish a causal connection between that event and Reeder's decision to reassign him from Andrews's leadership, an event that occurred well over a year later, in January of 2014.  *See McIntyre*, 460 F. Supp. 2d at 133 (three months is the outer limit of a claim based on temporal proximity alone); *see also Breeden*, 532 U.S. at 273 (temporal proximity between employer's knowledge of protected activity and adverse employment action must be "very close").  And there is no proof that Bentall

ever learned of plaintiff's protected activity.  So no reasonable jury would conclude that retaliation was the "but-for" cause of the reassignment.  *Nassar*, 133 S. Ct. at 2533.  Moreover, the proffered reason is amply supported by everything plaintiff placed into the record himself about his relationship with Andrews.

## CONCLUSION

For all of those reasons, defendant's motion for summary judgment will be granted.  A separate order will issue.

_____
AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2016